[No. C049527. Third Dist. Aug. 9, 2006.]

ENVIRONMENTAL COUNCIL OF SACRAMENTO et al., Plaintiffs and Appellants, v.
CITY OF SACRAMENTO et al., Defendants and Respondents;
ALLEGHANY PROPERTIES, INC., et al., Real Parties in Interest and Respondents.

**COUNSEL**

Law Office of James P. Pachl, James P. Pachl; Law Office of Donald B. Mooney and Donald B. Mooney for Plaintiffs and Appellants.

Morrison & Foerster, Clark Morrison, Andrew B. Sabey and R. Chad Hales for Defendants and Respondents City of Sacramento and County of Sutter.

Bill Lockyer, Attorney General, Tom Greene, Chief Assistant Attorney General, Mary E. Hackenbracht, Assistant Attorney General, and Bruce Reeves, Deputy Attorney General, for Defendant and Respondent California Department of Fish and Game.

Law Offices of Gregory D. Thatch and Larry C. Larsen for Real Parties in Interest and Respondents.

**OPINION**

**RAYE, J.**—California and federal law provide protection for fish, plant, and wildlife species that are threatened with extinction, and for their habitats. Habitat protections inevitably impact land use decisions and must be considered in evaluating the environmental impact of proposed development. However, protections accorded species like the Swainson's hawk and the giant

garter snake are not absolute. Development may proceed notwithstanding adverse impacts on endangered populations so long as the California Endangered Species Act (Fish & G. Code, § 2050 et seq.) and the California Environmental Quality Act (Pub. Resources Code, § 21000 et seq.) are complied with. Our task as a reviewing court, therefore, is not to determine whether the hawks and snakes of the Natomas Basin merit protection or whether they will fare better on the upgraded preserves guaranteed by the 2003 habitat conservation plan and the implementation agreement than they would if left alone. Rather, in the final analysis, the question we must resolve is whether public agencies met their responsibilities under the two acts and whether there is substantial evidence to support their findings.

State and federal wildlife agencies, city and county land use agencies, the federal district court, and the state trial courts found that the Swainson's hawk and the giant garter snake in the Natomas Basin would be protected by the 2003 habitat conservation plan and the implementation agreement.[1] Plaintiffs disagree. Having failed to invalidate the federal permits, they challenge the City of Sacramento (City) and the certification by Sutter County (Sutter) of the environmental impact report (EIR) under the California Environmental Quality Act (CEQA; Pub. Resources Code, § 21000 et seq.) and the issuance by the Department of Fish and Game (Department) of incidental take permits under the California Endangered Species Act (CESA; Fish & G. Code, § 2050 et seq.).[2] We affirm the trial court's denial of the petition for a writ of mandate because there is substantial evidence the City and Sutter discharged their duty to fully account for the environmental consequences of the 2003 habitat conservation plan and implementation agreement, and the Department upheld its responsibilities to protect threatened species.

## FACTS

*Natomas Basin*

Whereas plaintiffs portray the 53,537-acre Natomas Basin as a virtual paradise for the hawks and snakes, defendants contend the former flood basin, now home to canals, levees, pumping stations, and urban development, is significantly degraded with less than 10 percent of the native habitat remaining. No one disputes, however, that the hawks and snakes, both listed as threatened species under CESA, make their home in the basin for at least part of the year.

---

[1] It could be said that the real parties in interest are the Swainson's hawk and the giant garter snake. We will refer to these particular species as simply the hawk and the snake although there may be, unbeknownst to us, other varieties of hawks and snakes in the basin.

[2] Defendants include the City of Sacramento, Sutter County, and the California Department of Fish and Game.

Escaping Sacramento's tule fog, the hawks migrate to Mexico, Central America, and South America for the winter and return to the Central Valley in the spring. They nest in large trees along waterways and forage for small rodents in open fields with low vegetative cover. The more elusive snakes disappear during the winter as well, but bereft of wings they cannot abandon the valley, so they slither into drainage ditches, small mammal burrows, and other upland habitats. These snakes are found almost exclusively in the rice-growing regions of the Central Valley.

*The Habitat Conservation Plans*

In the 1990's city and county agencies, together with federal and state wildlife agencies, began negotiations on a conservation plan to protect the hawks and snakes of the Natomas Basin, along with 20 other identified plant and animal species. By 1997 they had drafted an expansive conservation plan with an accompanying implementation agreement. (*National Wildlife Federation v. Babbitt* (E.D.Cal. 2000) 128 F.Supp.2d 1274, 1277–1279 (*Natomas I*).) The federal and state wildlife agencies issued the requisite permits. (*Ibid.*) Although the state permits were upheld by the state court in *Friends of the Swainson's Hawk v. California Dept. of Fish & Game*, Superior Court Sacramento County, No. 98-CS-01131, the federal permits were not. (*Natomas I*, at p. 1302.) Thus, the wide assortment of public agencies returned to the drawing board to improve the conservation plan and to repair the federal deficiencies in the 1997 plan. (*National Wildlife Federation v. Norton* (E.D.Cal. Sept. 7, 2005, No. CIV-S-04-0579 DFL JF) 2005 U.S. Dist. Lexis 33768 (*Natomas II*).)

The revised Natomas Basin habitat conservation plan (Conservation Plan) and implementation agreement approved by the public agencies in 2003 was challenged again in federal and state courts. (*Natomas II, supra,* 2005 U.S. Dist. Lexis 33768; *Environmental Council of Sacramento v. City of Sacramento*, No. C049527, the case now before us.) The federal court found that the record supports the Secretary of the Interior's findings and issuance of the incidental take permits and the revised plan satisfies the requirements of the Endangered Species Act of 1973 (ESA; 16 U.S.C. § 1531 et seq.). (*Natomas II, supra,* 2005 U.S. Dist. Lexis 33768 at p. *2.) Similarly, the trial court denied plaintiffs' request for a writ of mandate, also concluding there was substantial evidence to support each of the public agencies' findings. Thus, the 2003 Conservation Plan and the accompanying implementation agreement are the focal point of this appeal.

According to defendants City and Sutter, the 2003 Conservation Plan "establishes a multi-species, long-term, regional conservation program to minimize and fully mitigate the expected loss of habitat values and incidental take of covered species that could result from 17,500 acres of authorized urban development." The plan states that 17,500 acres is the maximum number of acres that can be developed under the incidental take permits issued by the Department. "Incidental take" is a euphemism for incidental kill or capture. (Fish & G. Code, § 86.) None of the public agencies deny the risk that individual plants and animals in the basin will die if 17,500 acres are developed.

Nor does CESA categorically prohibit the destruction of their habitat. Rather, the law allows the Department to issue permits allowing the "take" if the impacts are "minimized and fully mitigated" in a manner "roughly proportional in extent to the impact of the authorized taking on the species." (Fish & G. Code, § 2081, subd. (b)(2).) To obtain an incidental take permit, an applicant must demonstrate that the mitigation measures are adequately funded and monitored (Fish & G. Code, § 2081, subd. (b)(4)) and that the action will not jeopardize the continued existence of the species (Fish & G. Code, § 2081, subd. (c)).

The Conservation Plan creates upgraded habitat and the mechanism to protect it. Under the plan, the Natomas Basin Conservancy (Conservancy), a nonprofit organization, will manage the habitat and monitor the health and welfare of the species, including the hawks and the snakes. The centerpiece of the plan is the purchase of one-half acre for habitat reserves for every acre that is developed, irrespective of the habitat quality of the land developed. The land acquisitions for reserves will be funded with mitigation fees paid by developers. The Conservancy will dedicate 50 percent of the 8,750 acres of reserve land to rice cultivation that serves as habitat for the snakes, 25 percent to managed marsh habitat for the snakes, and the remaining 25 percent in upland habitat for foraging opportunities for the hawks. The Conservation Plan provides multiple justifications for the 0.5:1 ratio: "(1) the reserves will provide higher quality habitat than the lands to be developed, especially given that the reserves will be managed for the covered species; (2) much of the land to be developed is of limited value as habitat but will be assessed as if it were of value; (3) the reserves will provide permanent habitat for the covered species; (4) the [Conservation Plan] provides monitoring and adaptive management to protect the species; and (5) the reserves will be large and biologically viable." (*Natomas II, supra*, 2005 U.S. Dist. Lexis 33768 at pp. *9–10.)

The Conservation Plan also imposes a number of measures to avoid and minimize any harm to the hawks and snakes. For example, the plan envisions the preservation of a hawk zone, a one-mile strip of land containing many of the hawks' nesting sites located along the Sacramento River. It further requires preconstruction surveys to determine the status and presence of all covered species and to identify the likely impacts of development on them. It prohibits noisy construction within one-half mile of an active hawk nest between March 15 and September 15. And it requires the planting of 15 trees for any hawk-nesting tree adversely impacted by development.

The Conservation Plan is just as sensitive to the needs of the snake. It restricts initial grading to the active period for snakes, that is, from May 1 through September 30, when they can be expected to move out of the way. If a snake is found, a complete dewatering of irrigation ditches, canals, or other aquatic habitat must occur for at least 15 consecutive days prior to the excavation or filling in of the dewatered habitat, which allows the snakes to leave on their own before construction continues.

The Conservation Plan is not static, nor is it confined to its initial assumptions. Cognizant that many factors might change during the 50-year life of the Conservation Plan, the public agencies designed an adaptive management program. In other words, both compliance monitoring and biological effectiveness monitoring may reveal ineffective management of the reserves or that the assumptions upon which the Conservation Plan was predicated have not held true over time. (*Natomas II, supra*, 2005 U.S. Dist. Lexis 33768 at pp. *11–13.) The Conservancy can respond to the deficiencies revealed by monitoring or periodic reviews. If unable to protect the species with these measures, the plan can be amended or revised, or the permits can be suspended or revoked.

As Judge Levi points out in rebuking the federal challenge to the Conservation Plan, it "contains several provisions designed to ensure that its environmental objectives will be achieved and that development will not outpace the acquisition of mitigation lands." (*Natomas II, supra*, 2005 U.S. Dist. Lexis 33768 at p. *11.) The Conservancy is obliged to acquire at least 200 more acres of reserve land than necessary to mitigate the impact of development approved to that date before any further development can be permitted. Mitigation fees must be increased, without a cap, when the costs of acquisition increase, although the Conservation Plan also allows developers to contribute mitigation land in lieu of fees.

Moreover, the permits cover only development expressly described in the Conservation Plan, and consequently, other public entities must undertake additional environmental review and obtain their own permits. Neither the

City nor Sutter can approve development in excess of the 17,500-acre ceiling in the absence of additional environmental review and amendment or revision of their permits. Ultimately, if the adaptive management measures fail and continued use of the permits jeopardizes the existence of a covered species, the Department can unilaterally revise the permits.

*CESA Meets CEQA*

Although the ESA requires a habitat conservation plan before the Secretary of the Interior can issue an incidental take permit, CESA does not. (*Natomas II, supra,* 2005 U.S. Dist. Lexis 33768 at p. *4.) Nevertheless, the Department "has made habitat conservation planning the centerpiece of its environmental protection policy." Indeed, the Department's permit application is modeled on the federal template, including, as it does here, a comprehensive habitat conservation plan. That is not to suggest, however, that the Conservation Plan itself satisfies CEQA. Rather, the Conservation Plan, together with the implementation agreement, is a project within the meaning of CEQA. As a result, the City and Sutter, as lead agencies, prepared an elaborate environmental analysis of the project. Petitioners contend the EIR is fatally flawed. We will examine the pertinent provisions of the EIR in response to each of the alleged deficiencies in the many pages that follow.

*Public Agency Findings*

Each of the public agencies made extensive findings in support of their respective decisions to certify the EIR, approve the project, and issue the incidental take permits. Those findings were based on volumes of evidence contained in the administrative record, including a biological resources technical memorandum prepared in February 2002, an addendum to the 2002 technical memorandum prepared in April 2003, and the master response to comments section of the final EIR. The Department's findings were also based on the findings of the United States Fish and Wildlife Service (Service) and the 2003 biological opinion prepared pursuant to ESA to obtain the federal incidental take permits.

The biologists and wildlife specialists who advised both the Service and the Department conclude that issuance of the permits will not jeopardize the survival and recovery of either the hawks or the snakes in the Natomas Basin and that implementation of the Conservation Plan will have a less than significant impact on both species. Although the scientists recognize that urban development will result in a loss of habitat, they opine that the enhanced and well-managed habitat created under the plan, augmented by aggressive monitoring and adaptive management, will fully mitigate the loss of habitat.

Specifically, the biologists reported that the hawks might lose three nests, but the potential risk of loss was offset by "the creation of additional nest sites at the habitat reserves, implementation of the tree planting program, and restoration of riparian habitat." And although development could reduce the amount of foraging habitat, the biologists believed it would not cause the hawks to abandon the basin because: the lost foraging habitat would be far from the nest sites and less valuable to the hawks, the hawk zone where most of the nest sites are located would be maintained by the Conservancy, the upland reserves would provide higher quality foraging habitat than the agricultural fields, the hawks are able to forage over large distances, and the upland reserves would be acquired with contiguity as a primary consideration.

Biologists were equally enthusiastic about the future of the snakes in the Natomas Basin. The snakes too will lose habitat to urban development, but the Conservation Plan would encourage the persistence of the snakes because: the managed marsh would provide a large amount of edge habitat; the quality of the managed marsh and rice fields in the reserves would be greater than the lost or compromised habitat; the habitat reserves would support a stable population because they would be stable in location, amount, availability, and quality over the years; basin-wide connectivity would be retained; and land around Fisherman's Lake, a popular hangout for snakes, would be preserved.

*Plaintiffs' Appeal*

Although plaintiffs present evidence to support their point of view, they fail to "lay out the evidence favorable to the other side and show why it is lacking." (*Defend the Bay v. City of Irvine* (2004) 119 Cal.App.4th 1261, 1266 [15 Cal.Rptr.3d 176].) Their failure to discredit the overwhelming evidence in support of the findings relieves us of the burden of independently reviewing the record. (*Ibid.*) It is not as if plaintiffs were without warning. Nevertheless, we have independently reviewed the record to make our own assessment of the sufficiency of the evidence.[3]

Many of plaintiffs' arguments are redundant. They dress up the same substantive complaint as a violation of both CEQA and CESA. We have attempted to consolidate and simplify the arguments by addressing the substantive complaints once and, where necessary, to demonstrate why the complaint lacks merit under each statute. At its essence, the appeal makes three allegations:

1. The agencies failed to consider the impacts that the joint vision memorandum of understanding (Joint Vision MOU) between the City and the

---

[3] In so doing, we pay deference to the agencies entrusted with protection of threatened and endangered species. (See *Center for Biological Div. v. U.S. Fish & Wildlife* (W.D.Tex. 2002) 202 F.Supp.2d 594, 603.)

County of Sacramento (County) and other looming development projects would have on the hawks and snakes.

2. The mitigation measures are impermissibly unfunded, voluntary, unenforceable, and infeasible.

3. The 0.5:1 ratio for the purchase of mitigation land is indefensible.

The public agencies remind us, as if we were at risk of forgetting, of the limited scope of appellate review of CEQA and CESA claims. We must review the record for a prejudicial abuse of discretion. (Pub. Resources Code, § 21168.5.) In the CEQA arena, plaintiffs bear the burden of proving a prejudicial abuse of discretion by establishing that the agencies' decisions are not supported by substantial evidence or that they failed to proceed in a manner required by law. (*Neighbors of Cavitt Ranch v. County of Placer* (2003) 106 Cal.App.4th 1092, 1099 [131 Cal.Rptr.2d 379]; *Barthelemy v. Chino Basin Mun. Water Dist.* (1995) 38 Cal.App.4th 1609, 1617 [45 Cal.Rptr.2d 688].) Substantial evidence means "enough relevant information and reasonable inferences from this information that a fair argument can be made to support a conclusion, even though other conclusions might also be reached." (Guidelines, § 15384, subd. (a).)[4]

A CESA challenge is brought under Code of Civil Procedure section 1094.5. Under section 1094.5, plaintiffs must show the agencies did not proceed in the manner required by law, their decisions are not supported by their findings, or their findings are not supported by substantial evidence. (Code Civ. Proc., § 1094.5, subds. (b), (c); *Sierra Club v. California Coastal Com.* (1993) 12 Cal.App.4th 602, 609–610 [15 Cal.Rptr.2d 779].) For the reasons that follow, plaintiffs have failed to expose an abuse of discretion under either statute.

## DISCUSSION

### I

### THE JOINT VISION MOU, CUMULATIVE IMPACTS, AND KNOWN THREATS TO SPECIES

In December 2002 the City and County adopted a memorandum of understanding outlining their "joint vision" as to how to approach future

---

[4] All references to "Guidelines" are to the CEQA Guidelines. (Cal. Code Regs., tit. 14, § 15000 et seq.)

agreements regarding land use in the Natomas Basin. The trial court characterized the City and County's Joint Vision MOU as a "roadmap" to guide future land use decisions. The federal district court characterized it as a " 'conceptual agreement' " designed to " 'establish principles to form the parameters of a future agreement or agreements.' " (*Natomas II, supra,* 2005 U.S. Dist. Lexis 33768 at p. *38.) Both courts emphasized that the Joint Vision MOU did not approve development, nor did it involve any specific development proposals. Indeed, land use planning; environmental review; biological resources evaluation; compliance with local, state, and federal laws; approval of the plan by the City, County, and Local Agency Formation Commission; and federal review under ESA and the terms of the Conservation Plan must all precede approval of development in the Natomas Basin.

The federal court described the Joint Vision MOU this way: "The MOU is not a concrete development proposal establishing a set level of development or land use patterns. [Citation.] No funds are committed. [Citation.] The MOU does not change the existing agricultural-use designation for any of the 10,000 acres. [Citation.] The MOU does not waive any existing land use requirements but explicitly contemplates the necessity for further discretionary approvals and environmental review. [Citation.] Given the tentative, general nature of the MOU and the considerable number of local, state, and federal approvals that would be required before any development of the 10,000 acres could occur, the Service did not err in determining that the Joint Vision development was not reasonably certain to occur and need not be considered by the Service in conducting its jeopardy analysis." (*Natomas II, supra,* 2005 U.S. Dist. Lexis 33768 at p. *38.)

Plaintiffs reassert the same arguments rejected by the federal court in *Natomas II.* They accuse the public agencies of pretending that development would be limited to 17,500 acres in the Conservation Plan and the final EIR, when in fact they were actually planning for the development of at least another 10,000 acres in the Natomas Basin. They challenge the assumption that agricultural land would remain viable habitat when the Joint Vision MOU anticipated more development, the City began to revise its general plan, and private developers submitted proposals for large-scale developments in the basin outside the permit areas. They allege that planners were marching in lockstep to the drumroll of development, deaf to the cries of concern raised by the wildlife agencies' own staffs.

These may or may not be valid policy concerns if raised in a political venue. But the issue, of course, is not the wisdom of the policies adopted by the public agencies, but whether they complied with CEQA and CESA. The

trial court and the federal court concluded that any future development in the basin was too speculative to trigger the duty to conduct an environmental analysis of unknown and unidentified projects. Needless to say, defendants urge us to adopt the same reasoning, but at the same time they point out that the final EIR fully disclosed the terms of the Joint Vision MOU as well as the other projects private developers hoped to pursue. In defendants' view, therefore, the environmental analysis provided goes above and beyond that required by either CEQA or CESA. We agree.

*Cumulative Impacts Under CEQA*

■ It is true, as plaintiffs suggest, that the Guidelines require a discussion of significant cumulative impacts, that is, "two or more individual effects which, when considered together, are considerable or which compound or increase other environmental impacts." (Guidelines, § 15355; see *id.*, 15130, subd. (a).) An adequate discussion should include a list of "past, present, and probable future projects producing related or cumulative impacts." (Guidelines, § 15130, subd. (b)(1)(A).)

California courts, in construing the Guidelines, are sensitive to the steamroller effect of development. Early approval of a project often generates sufficient momentum for future development despite the cumulative degradation of the environment. (*Laurel Heights Improvement Assn. v. Regents of University of California* (1988) 47 Cal.3d 376, 395 [253 Cal.Rptr. 426, 764 P.2d 278].) Yet premature environmental review requires rank speculation as to possible future environmental consequences, a needlessly wasteful drain of the public fisc. (*Ibid.*) To achieve a balance to provide meaningful environmental review that is not too early or too late, we must therefore be guided by standards of reasonableness and practicality. (*Del Mar Terrace Conservancy, Inc. v. City Council* (1992) 10 Cal.App.4th 712, 738 [12 Cal.Rptr.2d 785] (*Del Mar Terrace*), disapproved on other grounds in *Western States Petroleum Assn. v. Superior Court* (1995) 9 Cal.4th 559, 570, fn. 2 [38 Cal.Rptr.2d 139, 888 P.2d 1268].)

■ Plaintiffs insist the Joint Vision MOU, together with the agencies' actions to advance development, necessitates a thorough evaluation of the environmental consequences of development exceeding the 17,500-acre ceiling accepted in the Conservation Plan and the EIR. But the Guidelines and analogous cases suggest otherwise. "The sufficiency of an EIR as an informative document is judged 'in light of what is reasonably feasible.' (Guidelines, § 15151.)" (*Towards Responsibility in Planning v. City Council* (1988) 200

Cal.App.3d 671, 681 [246 Cal.Rptr. 317].) It is unnecessary to engage in "sheer speculation as to future environmental consequences," and it is unreasonable to expect an EIR to "produce detailed information about the environmental impacts of a future regional facility whose scope is uncertain and which will in any case be subject to its own environmental review." (*Ibid.*) Until specific measures or projects are adopted and the details fleshed out, the environmental impacts remain "abstract and speculative." (*Sacramento Old City Assn. v. City Council* (1991) 229 Cal.App.3d 1011, 1025 [280 Cal.Rptr. 478].) It is both impractical and useless to consider the multitude of potential environmental impacts before the financial feasibility is determined and the scope of the project is defined. (*No Oil, Inc. v. City of Los Angeles* (1987) 196 Cal.App.3d 223, 237 [242 Cal.Rptr. 37].) Simply put, "[a]n EIR is not required to include speculation as to future environmental consequences of future development that is unspecified and uncertain." (*National Parks & Conservation Assn. v. County of Riverside* (1996) 42 Cal.App.4th 1505, 1515 [50 Cal.Rptr.2d 339].)

█  We agree with the trial court and the federal district court that an environmental analysis now of the unspecified and uncertain development that might be approved in the future under the Joint Vision MOU would be speculative, wasteful, and of little value to the consumers of the EIR. Far too little is known about the scope, the location, or the types of projects that might be proposed in the future to assist decision makers in evaluating any potential environmental tradeoffs. Thus, the amorphous nature of possible development in the Natomas Basin stands in stark contrast to the related projects ignored in *Friends of the Eel River v. Sonoma County Water Agency* (2003) 108 Cal.App.4th 859, 870 [134 Cal.Rptr.2d 322] (*Eel River*) and *City of Antioch v. City Council* (1986) 187 Cal.App.3d 1325, 1338 [232 Cal.Rptr. 507] (*City of Antioch*).

Plaintiffs ignore the salient fact that the EIR's in both *Eel River* and *City of Antioch* failed to disclose the impacts of pending related projects. Here, the final EIR discusses the Joint Vision MOU at some length, accurately disclosing what was then known about the potential for development and what was not. In *Eel River*, however, the court chastised the EIR's obfuscation of the critical fact that if the water agency obtained approval of its pending proposal to divert additional water, it would have limited ability to supply water to its customers in an environmentally sound way. (*Eel River, supra,* 108 Cal.App.4th at p. 869.) Similarly, in *City of Antioch* the sole purpose of the proposed road and sewer project was to spur development in the immediate area, and yet the EIR failed to discuss the environmental impacts of the reasonably foreseeable development the project itself generated. (*City of Antioch, supra,* 187 Cal.App.3d at p. 1337.)

By contrast, there was nothing duplicitous or sneaky about the public agencies' disclosures here. The final EIR describes the Joint Vision MOU, albeit as the conceptual blueprint that it is. Unlike the diminution of the water supply in *Eel River* or the reasonably foreseeable development that would follow from the building of the road in *City of Antioch*, the Conservation Plan was designed to contain growth and enhance the survival of the species. Unlike the projects foreseeable on the horizon in *Eel River* and *City of Antioch*, the planning process outlined in the Joint Vision MOU did not identify any type of specific development project and consequently the contours of any project remained a mystery.

Nor do we accept plaintiffs' notion that certification of the EIR was void because it relied upon an invalidated guideline to support its failure to analyze cumulative impacts. Guidelines former section 15130, subdivision (b)(1)(B)(2) limited the type of future projects that must be analyzed in an EIR as follows: " 'Probable future projects' may be limited to those projects requiring an agency approval for an application which has been received at the time the notice of preparation is released, unless abandoned by the applicant; projects included in an adopted capital improvements program, general plan, regional transportation plan, or other similar plan; projects included in a summary of projections of projects (or development areas designated) in a general plan or a similar plan; projects anticipated as a later phase of a previously approved project (e.g. a subdivision); or those public agency projects for which money has been budgeted."

In *Communities for a Better Environment v. California Resources Agency* (2002) 103 Cal.App.4th 98 [126 Cal.Rptr.2d 441] (*Communities for a Better Environment*), we were concerned that the legislative choice of the word "or" rather than "and" allowed lead agencies to circumvent CEQA by allowing lead agencies to only consider one category of future probable projects and to fail to consider any of the other categories in a cumulative impacts analysis. Our elimination of a potential loophole created by Guidelines former section 15130, subdivision (b)(1)(B)(2) has no application here.

The EIR analyzed the cumulative effects of *all* past, present, and reasonably foreseeable development. We agree with defendants that plaintiffs have failed to identify any "probable future project" that was eliminated from the analysis based on the alleged failure to consider all the categories in Guidelines former section 15130, subdivision (b)(1)(B)(2). To reiterate, the Joint Vision MOU itself is not a project within the meaning of CEQA, nor does it propose any specific project amenable to meaningful environmental review. Thus, the EIR complied with our admonition in *Communities for a Better Environment* to consider the projects conjunctively, that is, to consider all past, present, and reasonably foreseeable probable future projects in its cumulative impacts analysis.

*Known Threats Under CESA*

█ Pursuant to Fish and Game Code section 2081, subdivision (c), the Department must consider "known threats to the species" and "reasonably foreseeable impacts on the species from other related projects and activities." Plaintiffs reiterate their complaint that the Department, like the City and Sutter, failed to consider the potential for development recognized in the Joint Vision MOU, the draft General Plan amendment, and the rumblings of landowners. They argue these efforts are a "known threat" and a "related project and activity" under section 2081 because new development is reasonably foreseeable, the development will further impact the habitat in the Natomas Basin, and the Joint Vision MOU fatally undermines the Conservation Plan's mitigation measures that rely on undeveloped land outside the permit areas, including habitat connectivity.

█ Plaintiffs have cited no cases, and we have not found any, to support their counterintuitive proposition that a vague planning document that does not qualify as a project under CEQA nevertheless constitutes a known threat to a species or a related project with reasonably foreseeable impacts on hawks and snakes. Because there is no proposed project or a pending application for an incidental take permit, the Department would be forced to hypothesize an endless number of scenarios about what would happen to the hawks if certain land were developed and what would happen to the snakes if other habitat were lost. We conclude that CESA, like CEQA, does not require wasteful speculation on potential projects yet to be conceived and described. Nor are we concerned here, as we are in other circumstances, that development will gain irreversible momentum or that the political roar for jobs and houses will silence the loyal stewards of the hawks and snakes. The Conservation Plan itself stands as a flexible, but comprehensive, bulwark against those who would jeopardize the threatened species in the Natomas Basin.

## II

## BASELINE ASSUMPTIONS AS MITIGATION MEASURES

█ Both CESA and CEQA require public agencies to mitigate for environmental degradation, including the taking of threatened or endangered species. Under CESA, the Department, before issuing an incidental take permit, must find that the impacts of the proposed take will be minimized and fully mitigated (Fish & G. Code, § 2081, subd. (b)(2)), the applicant will ensure adequate funding to implement the minimization and mitigation measures (§ 2081, subd. (b)(4)), and the permit sought will not jeopardize the continued existence of the species (§ 2081, subd. (c)).

■   Similarly, CEQA requires the appropriate public agency "to find, based on substantial evidence, that the mitigation measures are 'required in, or incorporated into, the project'; or that the measures are the responsibility of another agency and have been, or can and should be, adopted by the other agency; or that mitigation is infeasible and overriding considerations outweigh the significant environmental effects. ([Pub. Resources Code,] § 21081; Guidelines, § 15091, subd. (b).) In addition, the agency 'shall provide that measures to mitigate or avoid significant effects on the environment are fully enforceable through permit conditions, agreements, or other measures' ([Pub. Resources Code,] § 21081.6, subd. (b)), and must adopt a monitoring program to ensure that the mitigation measures are implemented (§ 21081.6, subd. (a)). *The purpose of these requirements is to ensure that feasible mitigation measures will actually be implemented as a condition of development, and not merely adopted and then neglected or disregarded.*" (*Federation of Hillside & Canyon Associations v. City of Los Angeles* (2000) 83 Cal.App.4th 1252, 1260–1261 [100 Cal.Rptr.2d 301], fn. omitted.)

Plaintiffs contend the agencies' mitigation measures remain unfunded, voluntary, and unenforceable, and therefore are in violation of CESA and CEQA. Those measures, according to plaintiffs, include the retention of vast amounts of agricultural land outside the permit areas, the maintenance of connected channels and ditches for the snakes, and the preservation of sufficient setbacks between habitat and development. Plaintiffs believe that the agencies' unwillingness to fund and enforce these mitigation measures jeopardizes the quality of life for the hawks and snakes in the Natomas Basin.

Plaintiffs' premise confuses the agencies' assumptions about the baseline conditions with necessary mitigation measures under CESA and CEQA. A similar attempt at mixing concepts was rebuffed in *Village Laguna of Laguna Beach, Inc. v. Board of Supervisors* (1982) 134 Cal.App.3d 1022 [185 Cal.Rptr. 41] (*Village Laguna*), albeit with a slightly different analytic twist. In *Village Laguna*, the opponents of the project criticized the EIR for making assumptions about the proposed project but failing to evaluate the environmental consequences if any of the assumptions proved erroneous. (*Id.* at p. 1029.) The EIR assumed a transportation corridor would be built, an extensive greenbelt would be preserved, and that a quarter of the dwelling units would be affordable. (*Id.* at pp. 1029–1030.) The opponents asserted there was no funding for the transportation corridor, the County of Orange might not accept the dedication of the greenbelt, and the stock of affordable housing would decline as the resale value escalated. (*Id.* at p. 1030, fn. 5.)

■   The Court of Appeal rejected the opponents' attempt to enlarge the role of assumptions. The court wrote: "Appellants are asking more of the EIR than is legally required. The 'assumptions' referred to are actually integral

portions of the proposed project. If they fail to become reality (e.g., if the transportation corridor is not built), we are dealing with a different project. However, CEQA only requires that an EIR discuss '[the] significant environmental effects of *the proposed project.*' ([Pub. Resources Code,] § 21100, subd. (a), italics added.) The proposed project, which includes the transportation corridor, a preserved Greenbelt and 25 percent affordable housing, *was* evaluated in the EIR. CEQA requires nothing more." (*Village Laguna, supra,* 134 Cal.App.3d at p. 1030.)

Whereas in *Village Laguna* the opponents faulted the EIR for failing to address different alternatives if the assumptions were not realized, plaintiffs fault the EIR and the Department's findings for failing to fund and somehow enforce the assumptions. Rather than demonstrating a lack of substantial evidence to support the baseline assumptions, in both cases the opponents of the projects have mischaracterized the assumptions as something they are not. A public agency can make reasonable assumptions based on substantial evidence about future conditions without guaranteeing that those assumptions will remain true. (Pub. Resources Code, § 21080, subd. (e); *City of Del Mar v. City of San Diego* (1982) 133 Cal.App.3d 401, 412 [183 Cal.Rptr. 898].) We join the court in *Village Laguna,* the federal court in *Natomas II,* and the trial court in this case in rejecting the misuse of baseline assumptions. Plaintiffs may be unhappy with the assumptions, but those assumptions are not mitigation measures required under the Conservation Plan.

The Conservation Plan and the EIR, notwithstanding plaintiffs' claims to the contrary, state that conservation of the hawks' and snakes' habitats is based on the assumption that approximately 15,000 acres in the Natomas Basin will remain agricultural. There is substantial evidence in the record to support this assumption, including historic land use patterns, adopted general plans and policies concerning this land, state and federal regulations, and limitations on the provision of water and sewer services. Moreover, under the implementation agreement, neither the City nor Sutter "may approve any urban development beyond the Authorized Development until the applicable Permittee conducts an evaluation of the effects of the additional development on the [Conservation Plan's] Operating Conservation Program, and the City's or the County's permit is amended to include the new areas or a new permit is issued for such additional areas." And finally, even if public and private entities were able to successfully amend the general plans, revise land use policies, and obtain or amend incidental take permits from both the state and federal wildlife agencies, they would remain subject to another CEQA review and be required to evaluate the effects of the proposed additional development on the effectiveness of the Conservation Plan.

Similarly, plaintiffs complain there is no guarantee the water agencies, which are not bound by any of the agreements, permits, or plans, will maintain the channels and ditches the snakes use throughout the Natomas Basin. The parties agree on the importance of retaining the connectivity of the habitat provided by the irrigation system, but they disagree on the likelihood the channels and ditches will be maintained during the life of the permits. Again, there is substantial evidence to support the baseline assumption.

In *Natomas II*, the federal court summarized the evidence the Service relied upon in reasonably concluding that hydrological connectivity would not be affected by the failure of the water districts to participate. According to the court, "First, the Service found that connectivity corridors will remain open because they will continue to be needed for drainage and irrigation of agricultural lands. . . . Second, the Service reasoned that any decision by the water agencies to close or fill the canals would necessarily require further federal consultation, either because the activity would result in a 'taking' under the ESA or because it would require a § 404 Clean Water Act permit, and that any adverse impacts to the [snake] could be mitigated at that time. [Citation.] Third, the Service noted that the [Conservation Plan] includes other measures to protect connectivity, including yearly evaluations of connectivity and the use of mitigation fees to purchase canals or channels, if needed. [Citation.] Finally, and closely related to the third point, the Service also relied on the [Conservancy's] status as a landowner and, therefore, as a shareholder in the Natomas Mutual Water Company, increasingly able to influence the water company's decision-making as the [Conservancy] acquires new land and shares." (*Natomas II, supra,* 2005 U.S. Dist. Lexis 33768 at pp. *27–29.)

The City reminds us that even if some canals are closed in the future, the Conservation Plan maintains connectivity. Specifically, connectivity can be maintained by relocating reserve components, reaching agreements concerning use of the canals with canal owners or operators, and purchasing easements along canals or the canals themselves. As further protection, any water agency closing a canal would have to comply with federal ESA requirements, as well as with the National Environmental Policy Act of 1969 (42 U.S.C. § 4321 et seq.), CEQA, and the Clean Water Act of 1977 (33 U.S.C. § 1251 et seq.). In sum, the agencies relied on ample evidence to support their respective findings that habitat connectivity was not at risk.

Similarly, plaintiffs fear that the 800-foot setbacks will be lost to urban encroachment. But here they mistake acquisition criteria in purchasing the

reserve lands for a mitigation measure. The Conservation Plan does not require the setback zones to remain undeveloped indefinitely. The plan states: "Setback zones shall be considered prior to the acquisition of reserve lands [and] the reserve land setback zone does not affect the ability of each of the Land Use Agencies to approve development within the setback zone and adjacent to the boundaries of reserve lands." The setback zones are not included in the 8.750 acres of mitigation land established by the Conservation Plan, and consequently, the conservation program does not depend on these zones remaining undeveloped. Rather, the Conservation Plan guides the Conservancy to acquire habitat land with a sufficient buffer from urban development. We will not violate the spirit of the plan, or the spirit of CEQA and CESA, by translating guidance into mandates and mandates into mitigation measures that must be funded and enforced.

Finally, plaintiffs insist that the drafters characterize the so-called "assumptions" as mitigation throughout the Conservation Plan and the EIR. Plaintiffs' extractions of isolated text are misleading. For example, plaintiffs fail to point out that the plan explicitly states "the Operating Conservation Program does not include the continuation of agriculture in the Basin as mitigation" or that the Conservation Plan "does not rely on existing agriculture in the Natomas Basin as mitigation" or that "additional foraging areas . . . are not mitigation included in the [Conservation Plan]."

## III

## MITIGATION MEASURE ADEQUACY: THE MITIGATION RATIO

Plaintiffs find the purchase of a half-acre for habitat reserves for every acre of development lacking under both CEQA and CESA. They contend that a 1:1 ratio is more generally accepted, a practice the City and County apparently recognized in adopting their Joint Vision MOU, which provides for an acre of open space for every acre approved for development. They accuse the agencies of shady and hypocritical conduct by rejecting the 1:1 mitigation ratio as part of the Conservation Plan but at the same time accepting it in the Joint Vision MOU, by relying on outdated scientific information, and, most troubling in their view, by hiding a consultant's earlier report's findings that increased mitigation fees were feasible.

■    If, as so many courts have said, the EIR is the heart of CEQA, then to continue the anatomical metaphor, mitigation is the teeth of the EIR. A gloomy forecast of environmental degradation is of little or no value without pragmatic, concrete means to minimize the impacts and restore ecological equilibrium. Thus, CEQA *requires* project proponents to mitigate all significant environmental impacts of their project (Pub. Resources Code, §§ 21002, 21002.1, subds. (a), (b); Guidelines, §§ 15126.4, 15370), and CESA *compels* applicants to "fully mitigate[]" the take of threatened or endangered species (Fish & G. Code, § 2081, subd. (b)(2)). Cognizant of their heavy burden to mitigate under both statutes, the City and Sutter fashioned an enormously comprehensive and integrated mitigation plan. Plaintiffs parse but one component from the integrated mitigation program, ignoring the broader context, the broader findings, and the broader evidence relied on by the agencies.

The Conservation Plan in fact mitigates for the impacts on covered species in a variety of ways beyond the purchase of a half-acre for every acre developed. The reserves purchased with the mitigation fees will be maintained as habitat in perpetuity. Moreover, the Conservancy is mandated by the Conservation Plan to manage rice farms, which might otherwise disappear from the Natomas Basin. The preconstruction surveys, preservation of land adjacent to Fisherman's Lake, avoidance of development in the one-mile hawk zone, and preservation and planting of nest trees are all part of the integrated mitigation plan designed to compensate for the incidental take of any covered plants and animals.

As required by CEQA, the EIR examined alternatives to the proposed project and provided decision makers with a feasibility analysis that evaluated a broad range of the implications of each alternative, including, but not limited to, the financial implications. Plaintiffs would have preferred the agencies to adopt an alternative providing at least a 1:1 mitigation ratio. The City and Sutter rejected the 1:1 mitigation ratio, however, because it could lead to a "reduction in levels of development," the "failure to implement a jurisdiction's General Plan or Community Plan," and at the very least a slowing of "the progress of necessary development such that the public's health and welfare is harmed through lack of economic growth and productivity and a shortage of housing supply." Ultimately, the 1:1 mitigation ratio was rejected "based on issues of feasibility, practicality in meeting planned objectives and overriding considerations."

■    The legal implications of the mitigation ratio are as significant as the impact on regional planning to provide residents with houses and jobs. The City and Sutter found the 1:1 ratio alternative infeasible expressly because it "would result in . . . developers paying Mitigation Fees at a level which would exceed the impact caused by their projects." Defendants correctly

point to the legal feasibility constraints on the mitigation ratio. Mitigation measures must be roughly proportional to the impacts caused by the project. (Guidelines, § 15126.4, subd. (a)(4)(B); *Napa Citizens for Honest Government v. Napa County Bd. of Supervisors* (2001) 91 Cal.App.4th 342, 360 [110 Cal.Rptr.2d 579].)

Despite the proportionality limitation, every acre within the permit areas must be replaced at the mitigation ratio, whether or not the land proposed for development provides habitat, and regardless of the quality of habitat or existence of known or documented species occurrences. We agree with defendants that plaintiffs tend to equate habitat loss with take. The two are not synonymous.

■ We reject any insinuation that the definition of "take" under Fish and Game Code section 2081, subdivision (b)(2) encompasses the taking of habitat alone or the impacts of the taking. As section 86 of the Fish and Game Code makes clear, proscribed taking involves mortality. In this case, there is little evidence forecasting how many animals will actually be killed as a result of development in the Natomas Basin. The difficulty in calculating the potential take of the hawks is particularly vexing because they are only part-time residents of the basin and are adept at foraging in nearby Yolo County. Thus, not only is the habitat throughout the basin of uneven value, but the Department's ability to coerce developers to mitigate is further circumscribed by the limited data on the scope of the actual take.

Given the legal parameters requiring mitigation proportional to the take, therefore, the 0.5:1 mitigation ratio appears far more generous than plaintiffs would have us believe. The Department's CESA findings explain: "Thus, because the area has relatively uniform low to moderate habitat values, all Authorized Development within the Land Use Agencies' Permit Areas pay Mitigation Fees toward the acquisition, enhancement and management of habitat reserves, regardless of the actual habitat values affected by Covered Activities at a specific location. Along these lines, the species impact assessment in the administrative record of proceedings assumes that any land that might provide habitat, regardless of the quality of the habitat, and regardless of the known or documented occurrence or presence of a Covered Species, is nonetheless considered impacted habitat. Under this conservative approach, the Department finds the mitigation measures imposed by the [incidental take permits] issued to the Permittees in reliance on the 2003 [Conservation Plan] are roughly proportional under CESA to the impacts of taking on Covered Species that will result from authorized Covered Activities."

■ Plaintiffs assert that a 1:1 ratio is more consistent with comparable mitigation measures. They accuse the agencies of hypocrisy in finding the

higher ratio feasible in the Joint Vision MOU and infeasible in the Conservation Plan, and they dispute the idea that habitat in the Natomas Basin is degraded. We reject their assertions for three reasons. First, "adherence to alleged 'historic ratios' is not required by CEQA, which does not mandate similar mitigation for all similar projects." (*Del Mar Terrace, supra,* 10 Cal.App.4th at p. 741.) In *Natomas II,* the court found economic comparisons with other jurisdictions of little value in the absence of evidence that the land covered by different conservation plans had similar market conditions and land use plans. (*Natomas II, supra,* 2005 U.S. Dist. Lexis 33768 at p. *55.) Second, the agencies have not adopted a 1:1 mitigation ratio pursuant to the Joint Vision MOU because they have not considered any specific development proposal. And third, their portrayal of the current state of the Natomas Basin as lush and vibrant is based largely on descriptions and accounts that are at least a decade old.

As for the agencies' findings that a 1:1 mitigation ratio was not financially feasible, plaintiffs contend the findings were not supported by substantial evidence because they were predicated on outdated and incomplete information. In particular, they complain that the agencies failed to disclose that a consultant who prepared the feasibility analysis in June 2001 concluded that a 1:1 or even a 2:1 mitigation ratio under the Joint Vision MOU " '[does] not approach the level at which our firm sees problems with residential project financial feasibility.' "

There is substantial evidence, however, the City and Sutter did not rely on outdated economic figures. The final EIR disclosed updated figures that the economic feasibility of nonresidential development continued to push feasibility thresholds. Plaintiffs focus exclusively on the increased price of residential housing to bolster their argument that developers could tolerate enhanced mitigation fees. We need not justify every aspect of the analyses either put in, or left out of, the EIR. Suffice it to say, there is sufficient evidence that the higher mitigation ratio would impede regional development, transgress legal parameters, and present financial impediments to implementation of the Conservation Plan. (See *Natomas II, supra,* 2005 U.S. Dist. Lexis 33768 at pp. *54–59 for an in-depth discussion of the economic feasibility analysis.) In light of this evidence, we are not at liberty to second-guess the agencies' conclusions that the 1:1 ratio alternative was not feasible and that full mitigation can be accomplished by a habitat conservation plan that is founded upon both qualitative and quantitative principles, rather than merely upon an acre-for-acre ratio.

## IV

## ADEQUACY OF EVIDENCE REGARDING CESA
## FINDINGS

Plaintiffs challenge the sufficiency of the evidence to support the Department's finding that the Conservation Plan will minimize and fully mitigate the incidental take of the hawks and snakes, that the permits will not jeopardize the continued existence of either species, and that the mitigation measures will be adequately funded. We review the evidence with full appreciation of our assigned role. We are neither scientists nor policy makers. The agencies entrusted with the statutory obligation of balancing the needs of human populations with those of endangered plants and animals are guided by the expertise of their scientific staffs and independent consultants. We cannot supplant their decisions because we find the views of other experts and other policy options more appealing.

Plaintiffs acknowledge that the same federal court that disapproved of the 1997 Conservation Plan has upheld the environmental integrity of the 2003 Conservation Plan now before us. (*Natomas II, supra,* 2005 U.S. Dist. Lexis 33768.) Although many of the issues addressed by the court in *Natomas II* are raised again here, plaintiffs barely mention the opinion, with but a brief reference to the more relaxed standard for requiring a cumulative impacts analysis. But plaintiffs have failed to demonstrate how the federal court's analysis is faulty in the same way they fail to demonstrate the deficiencies in the volumes of evidence in support of the Department's findings. Instead, they cite to other scientists, in particular James Estep, Michael Bradbury, and Eric Hansen, ignoring Judge Levi's poignant admonition that "the court defers to the agency's reasonable resolution of conflicting opinions from experts, since the Service's wildlife experts are in a much better position than the court to evaluate such evidence." (*Natomas II, supra,* 2005 U.S. Dist. Lexis 33768 at p. *53.)[5]

Like Judge Levi, we exercise the required deferential standard of review. We will not arbitrate between scientists and we will not intrude on the public agencies' duties to make policy and protect the species. Given how much has already been written by the trial court, by Judge Levi, and by us on the

---

[5] In a similar vein, plaintiffs contend the Department did not rely on the "best scientific and other information that is reasonably available" as required by Fish and Game Code section 2081, subdivision (c). They cite to internal reviews of earlier drafts of the Conservation Plan by members of the Department's staff. Vibrant internal debate and dissension throughout the environmental review process is healthy. We reject plaintiffs' innuendo that critiques of drafts means that the ultimate decision to approve the Conservation Plan is not supported by the best scientific information available.

integrity of the Conservation Plan, we need only provide a thumbnail sketch of some of the evidence that, from our vantage point, appears more than sufficient to support the Department's CESA findings.

*The Conservation Plan Minimizes and Fully Mitigates the Incidental Take*

Fish and Game Code section 2081, subdivision (b) requires that "[t]he impacts of the authorized take shall be minimized and fully mitigated." We have described at some length the impressive avoidance, minimization, and mitigation features of the Conservation Plan, including the purchase of reserve lands to be developed and maintained as high quality habitat, adaptive management, adjustments because of recovery plan adoption, and extensive compliance and biological effectiveness monitoring. The Department's findings that the entire Conservation Plan minimized and fully mitigated the impacts of the taking are further supported by the scientific assessment of the Natomas Basin in that several covered species do not occur in the basin or their use of the basin is low and sporadic, the basin constitutes an insignificant portion of most of the species' ranges, and habitat remains available within and outside the basin to satisfy species' essential behavioral needs.

*The Conservation Plan Does Not Jeopardize the Hawks or the Snakes*

Presumably because the Conservation Plan minimizes and fully mitigates the impacts of the take of the threatened species, the Department also found it would not jeopardize the continued existence of the hawks and snakes. The Department's findings are supported by evidence not only that the hawks and snakes will survive but also, in all likelihood, when the Conservation Plan is implemented, that they will thrive.

For example, because the Conservation Plan requires the retention and maintenance of sufficient nesting and foraging habitat to mitigate for any loss of hawk habitat, the purchase of reserve land for high quality upland habitat, and the establishment of a nest tree planting program, the Natomas Basin will continue to support long-term survival of the hawk. The Department's findings are based on evidence in the February 2002 biological resources technical memorandum, the April 2003 addendum to the biological resources technical memorandum, the master responses to comments section of the final EIR, and the biological opinion of the Service.

The present plight of the snake in the Natomas Basin is bleaker. The Department recognized that current land use practices already threaten the snake throughout its range. Implementation of the Conservation Plan, however, will not jeopardize the snake because high quality managed marsh will be created and rice lands will be managed precisely for the benefit of the

snake. Thus, snake habitat will be relatively free of human intrusion, including farming; will be available year round; will be protected in perpetuity; and will not be fallowed. Because the Conservation Plan also assures canal connectivity and promotes setback zones, in addition to the extensive mitigation measures, the Department reasonably concluded that the incidental take authorization would not jeopardize the continued existence of the snake. The record amply supports the no jeopardy finding.

*The Conservation Plan Will be Adequately Funded*

CESA requires the applicant for an incidental take permit to "ensure adequate funding" to implement minimization, mitigation, and monitoring measures. (Fish & G. Code, § 2081, subd. (b)(4).) The Department found that the City and Sutter ensured there was adequate funding to implement the Conservation Plan. Again, there is substantial evidence to support the findings.

Mitigation fees will be imposed on developers, and these fees will be reviewed annually and adjusted to reflect the actual costs of the Conservation Plan. Unlike the 1997 Conservation Plan, there is no cap on the mitigation fees, so the fees can be increased whenever necessary. Moreover, even if the cost of the land causes the mitigation fees to become exorbitant, the Conservation Plan allows the City and Sutter to accept land dedications from developers in lieu of the mitigation fee devoted to land acquisition. And finally, the Conservation Plan prohibits issuance of grading permits until the Conservancy establishes a 200-acre cushion of mitigation lands to ensure adequate habitat precedes development. The Department relied on economic analyses that indicated these funding mechanisms, farming revenues, hunting revenues, endowments, and contingency funds would adequately fund the implementation of the mitigation plan. Nothing more is necessary.[6]

---

[6] Plaintiffs complain of two technical deficiencies under CEQA. They assert that the City and Sutter violated Public Resources Code section 21081 by failing to incorporate explicit findings that changes had been incorporated or required to avoid or mitigate the significant environmental impacts of the project. The EIR concluded that with the implementation of the host of mitigation measures, all biological impacts would be less than significant. The requisite findings are implicit in the extensive findings that the host of avoidance, minimization, and mitigation measures set forth in the Conservation Plan and evaluated in the EIR rendered the adverse impacts in the covered species less than significant. Second, plaintiffs criticize the Department's failure to make CEQA findings. But as the trial court properly found, the Department, as a responsible agency under CEQA, "was required under Public Resources Code section 21167.3 to presume the validity of the lead agencies' environmental impact report because of the filing of this action challenging the City and Sutter County's EIR." We do not disagree with plaintiffs' entirely separate contention that the Department must exercise its own independent judgment in issuing the incidental take permits. We have reviewed the exercise of that judgment at length throughout the body of this opinion.

## DISPOSITION

Because the public agencies have scrupulously executed their duties under CEQA and CESA, the judgment is affirmed.

Blease, Acting P. J., and Davis, J., concurred.