Filed 1/26/24  Environmental Protection Information Center v. Dept. of Fish and Wildlife CA1/2

**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FIRST APPELLATE DISTRICT

DIVISION TWO

| | |
|---|---|
| ENVIRONMENTAL PROTECTION INFORMATION CENTER et al., <br><br> Petitioners and Appellants, <br><br> v. <br><br> DEPARTMENT OF FISH AND WILDLIFE, <br><br> Respondent; <br><br> GREEN DIAMOND RESOURCE COMPANY, <br><br> Real Party in Interest and Respondent. | A163051 <br><br> (Humboldt County <br> Super. Ct. No. DR190416) |

Petitioners Environmental Protection Information Center and Center for Biological Diversity (collectively, Centers) appeal the trial court's order denying their petition for writ of mandate filed against respondent Department of Fish and Wildlife (Department).  The petition challenged a safe harbor agreement (Agreement) that the Department entered into with real party in interest Green Diamond Resource Company (Green Diamond) pursuant to the California Endangered Species Act (CESA).

CESA prohibits the "taking" (that is, the killing, capturing, or harming) of an animal of an endangered or threatened species, including

1

unintentionally.  But the Safe Harbor Agreement Program Act (Safe Harbor Act) provides an exception to the no-take mandate.  Intended to "encourage landowners to manage their lands voluntarily to benefit endangered, threatened, or candidate species" (Fish & G. Code, § 2080),[1] the Safe Harbor Act allows landowners and the Department to enter into agreements requiring landowners to undertake conservation measures, spelled out in the agreements, that the Department reasonably expects to provide a net benefit to an endangered species.  (§ 2089.6, subd. (a)(3))  In return, the landowner receives the benefit of a safe harbor from liability for incidentally taking members of the species on its land.  (§ 2089.6, subd. (a).)  Modeled on a similar program of the federal Endangered Species Act, the underlying insight of the Safe Harbor Act is that landowners may be discouraged from undertaking conservation measures that draw more endangered animals onto their land if they become subject to take liability as a result; granting them a safe harbor gives them incentives to improve their land in ways that benefit a species without increasing the prospect of take liability.

The Agreement at issue here concerns Humboldt martens, a small predatory mammal of the weasel family that was designated as an endangered species in 2018 by the Fish and Game Commission (Commission).  Humboldt martens were once widespread throughout the coastal forests of Northern California, but extensive fur trapping and the loss of coastal redwood forest habitat through logging have decimated marten populations over the last century.  Scientists believed they were extinct until 1996, when the paw prints of a Humboldt marten were found on a tracking plate in Del Norte County.  Presently, the population of Humboldt martens is believed to

---

[1] All further statutory references are to the Fish and Game Code unless otherwise specified.

2

number fewer than 100 individuals, and in California today these creatures are believed to live only in Humboldt and Del Norte Counties.

Green Diamond owns land and conducts logging operations in those counties. Humboldt martens are largely absent from Green Diamond's land, but the northern portion of Green Diamond's land sits between marten-inhabited land and protected parklands with old-growth coastal redwoods that are likely very suitable for martens. A group of biologists undertook an extensive assessment of how to improve martens' conservation prospects and concluded that expanding martens' range into the protected parklands was a promising strategy, either by capturing and relocating martens or by improving potential marten habitat that would connect to the parklands and encourage martens over time to migrate and expand their range.

In general terms, the Agreement purports to implement that conservation strategy on Green Diamond's land over its 40-year term: the Agreement sharply limits logging in two discrete areas of Green Diamond's land where martens are presently found; in other areas, it requires Green Diamond to make a variety of incremental adjustments to its logging operations that may make Green Diamond's property more hospitable as an expanded range for martens; and it requires Green Diamond to fund a study of the feasibility of relocating martens onto a portion of Green Diamond's land that is closer to the parklands, and to contribute funds toward relocation if it is found feasible.

The Department found that the Agreement was reasonably expected to provide a net conservation benefit to martens, and the incidental take that it authorized would not jeopardize the species' continued existence. The Centers challenge these findings as unsupported by substantial evidence in the administrative record. We acknowledge the modest and incremental

3

nature of many of Green Diamond's habitat-improvement commitments in what the Agreement calls the Marten Special Management Area (Management Area). But we nonetheless conclude that the Department's determination was supported by substantial evidence. For the Marten Reserve Area, where martens are presently found, the Agreement unquestionably provides a benefit to them by limiting Green Diamond to one logging entry over the life of the Agreement. For the Management Area, martens are largely absent but may migrate there (either on their own or through relocation after a feasibility study). The Department concluded that Green Diamond's commitments will improve the Management Area as potential habitat for martens. How great an improvement, and whether these measures are enough to create viable new habitat for martens on Green Diamond's logged lands, are admittedly uncertain. But CESA does not require scientific certainty, and the Department's judgment of a reasonable expectation of benefit to martens finds support in the administrative record, particularly where the detriment to martens from any incidental take cannot occur in the Management Area unless there is first a benefit—that is, unless martens find the area improved enough to migrate there, or unless the feasibility study concludes that martens can safely be moved to the Management Area. For these reasons and others discussed below, we affirm the judgment.

## BACKGROUND

We turn now to a more detailed discussion, first describing the purpose and scope of CESA and the Safe Harbor Act to provide context for the Centers' challenge.

4

# I.

## *CESA*

CESA was enacted in 1984 "to conserve, protect, restore, and enhance any endangered species or any threatened species and its habitat." (§ 2052.) It defines "endangered species" as "a native species or subspecies . . .which is in serious danger of becoming extinct throughout all, or a significant portion, of its range due to one or more causes, including loss of habitat, change in habitat, overexploitation, predation, competition, or disease." (§ 2062.)

The Commission is tasked with establishing the lists of endangered and threatened species and adds or removes species from these lists "based solely upon the best available scientific information." (§ 2070.) Once a species is listed, no person or public agency may "take" a member of that endangered or threatened species. (§ 2080.) "Take" is defined as "hunt, pursue, catch, capture, or kill, or attempt to hunt, pursue, catch, capture, or kill." (§ 86.) Thus, an action may be a "take" even without killing or hurting an endangered or threatened animal. (*Center for Biological Diversity v. Department of Fish & Wildlife* (2015) 62 Cal.4th 204, 235–236.) The penalties for a "take" are high: a fine of $25,000 to $50,000 "or imprisonment in the county jail for not more than one year, or both that fine and imprisonment." (§ 12008.1.)

The Department implements and enforces CESA's provisions. As part of this statutory scheme, the Department may authorize the take of an endangered or threatened species under certain circumstances, including through the issuance of an incidental take permit (§ 2081.1) or as part of implementing a natural community conservation plan (§ 2835).

## II.

### *The Safe Harbor Act*

In 2009, CESA was amended to include the Safe Harbor Act. (§§ 2089.2-2090.25, added by Stats. 2009, ch. 184, § 1.)  Recognizing that much of California's current and potential habitat for endangered species "exists on property owned by private citizens," the Safe Harbor Act emphasizes the need for "a collaborative stewardship approach to these lands" for conservation purposes.  (§ 2089.2, subd. (b).)  To that end, the Safe Harbor Act's aim is to "encourage landowners to manage their lands voluntarily to benefit endangered, threatened, or candidate species, or declining or vulnerable species, and not be subject to additional regulatory restrictions as a result of their conservation efforts."  (§ 2089.2, subd. (c).)

The Safe Harbor Act allows the Department to authorize the incidental taking of a covered species through a safe harbor agreement with the landowner if eight enumerated conditions are met.  (§ 2089.6, subd. (a).)  In particular, and as relevant to this appeal, the Department must find that (1) "the implementation of the agreement is reasonably expected to provide a net conservation benefit to the species" and (2) any incidental take under the agreement "will not jeopardize the continued existence of the species." (§ 2089.6, subd. (a)(3), (4).)

The Safe Harbor Act further states that the program "is designed to increase populations, create new habitats, and enhance existing habitats. Although this increase may be temporary or long term, California safe harbor agreements shall not reduce the existing populations of species present at the time the baseline is established by the department."  (§ 2089.2, subd. (d).)  In other words, incidental taking is still prohibited under the agreement if the

6

taking would cause the population of the covered species to fall below the population identified by the Department at the time of the agreement.

"Baseline conditions" mean "the existing estimated population size, the extent and quality of habitat, or both population size and the extent and quality of habitat, for the species on the land to be enrolled in the agreement . . . .  Baseline conditions shall be determined by the department, in consultation with the applicant, and shall be based on the best available science and objective scientific methodologies.  For purposes of establishing baseline conditions, a qualified person that is not employed by the department may conduct habitat surveys, if that person has appropriate species expertise and has been approved by the department." (§ 2089.4, subd. (b).)

### III.

### *Humboldt Martens and Their Habitat*

Humboldt martens, a subspecies of Pacific martens,[2] historically inhabited the coastal forests of Northern California and coastal Oregon. After extensive fur trapping beginning in the late 1800s and then habitat loss due to logging of coastal redwood forests, Humboldt martens' population was extirpated to the point where this species was believed to be extinct.  In 1996, a single marten was detected in Del Norte County, and more martens were later detected in limited numbers, including near the California-Oregon border.  Humboldt martens presently occupy less than 5 percent of their historical range, and their current population is believed to be fewer than 100 martens.

---

[2] Martens are carnivorous mammals that belong to the mustelid family, which also includes fishers, weasels, and minks.

7

In 2011, the Humboldt Marten Conservation Group (Conservation Group) "was formed to address the conservation needs for the Humboldt marten and to develop a conservation strategy." Among the members of the Conservation Group were the United States Fish and Wildlife Service, the Department, Green Diamond, the Redwood National Park, and the Department of Parks and Recreation. In 2015, the Conservation Group published a comprehensive document titled "A Conservation Assessment and Strategy for the Humboldt Marten . . . in California and Oregon" (Assessment).

With respect to habitat needs, the Assessment noted that Humboldt martens "most strongly selected stands of old growth, conifer-dominated forests with dense, ericaceous shrub layers." Along coastal California and southern coastal Oregon, martens "also have used forest and shrub dominated habitats occurring on less productive serpentine soils [or] serpentine habitats." These habitats offer "large trees and dead wood to provide prey resources, resting structures, and escape cover to avoid predators." (In particular, martens are prey for bobcats, which tend to be found in recently clear-cut or wildfire-devastated areas; by contrast, bobcats are largely absent from "landscapes composed of a mix of 40-60 year old regenerating stands and old growth or . . . unmanaged mid- and late-successional stands.")

Martens, according to the Assessment, "are very sensitive to the loss and fragmentation of high quality habitat," but "with careful management to maintain and regenerate critical structures and if certain thresholds are not surpassed, martens can be maintained along with timber production."

The Assessment highlighted that the "overall goal of the conservation strategy is to establish self-sustaining, interacting populations of Humboldt

martens within suitable habitat throughout their historical range in the Assessment Area." Among the strategies in support of that overarching goal, the Assessment identified two that are relevant to the Agreement: promoting expansion by martens into suitable but unoccupied habitat, and improving degraded habitat near extant populations so that martens can expand their range. The Assessment also identified what it called "Connectivity Improvement Areas," defined as "currently unsuitable habitat adjacent to or between" current marten habitat and potential new marten habitat—in other words, an area that could be used as a land bridge between a current marten population area and a new habitat for martens. A portion of Green Diamond's timberland in Humboldt County was identified as a potential land bridge because of its location between an area with an extant marten population to the east and suitable but unoccupied habitat to the west in state and national parks with old-growth, unlogged forests. The Assessment cautioned, however, that "habitat restoration or management actions may take *decades* to produce suitable habitat conditions supporting functional connectivity. Therefore, translocation of individuals to unoccupied suitable areas should be evaluated." (Italics added.)

## IV.

### *The Safe Harbor Agreement*

In June 2015, the Centers petitioned the Commission to list Humboldt martens as an endangered species under CESA. In August 2018, after completing its formal review, the Commission listed Humboldt martens as an endangered species.[3] (See Cal. Code Regs., tit. 14, § 670.5, subd. (a)(6)(J).) In

---

[3] A "candidate species" being reviewed by the Commission for addition to the list of endangered or threatened species is afforded the full protection of an endangered or threatened species under CESA during the period of review. (§§ 2068, 2085.)

February 2016, while the Commission's review of the petition was still pending, Green Diamond submitted an application to the Department to enter into a safe harbor agreement.[4] The Department rejected the initial draft agreement submitted by Green Diamond, finding it did not provide a net conservation benefit to martens. Two years of negotiations between the Department and Green Diamond followed, and the Department approved the Agreement in April 2018.

The Agreement is for a term of 40 years and covers 363,967 acres of "Enrolled Lands" owned and managed by Green Diamond for timber harvesting. At the time of the Agreement, Humboldt martens had been detected in two discrete areas of the Enrolled Lands, but were otherwise "rare or absent from the majority of the Enrolled Lands." For purposes of establishing "baseline conditions," the existing marten population on the Enrolled Lands was estimated to be "likely very small and transitory." The Agreement also noted that the martens' "use of habitat within the Enrolled Lands remains unknown because [their] expansion into managed lands is limited and a recent discovery. Therefore, "[a] reliable and accepted definition of suitable habitat for [martens] on managed coastal redwood forest does not exist." The "starting point for baseline habitat conditions" was determined to be "an average forest age of approximately 41 years."[5]

---

[4] As the Centers point out, Green Diamond opposed the listing of Humboldt martens as an endangered species during a February 11, 2016 public hearing before the Commission, based on concerns the listing would have on its operations.

[5] The administrative record reveals that the Department and Green Diamond engaged in extensive negotiations regarding what to establish as the baseline for the Agreement. Some Department scientists believed that average forest age was a poor metric because it did not capture what was important about a patch of forest to martens; one very old tree could skew the average upward, and martens rely on forest stands rather than individual

The Agreement includes various commitments by Green Diamond with respect to assisted dispersal, habitat management, take avoidance and minimization, and monitoring and reporting. We discuss these commitments below.

## A. Assisted Dispersal

The Assessment recommended that "translocation of martens to unoccupied suitable areas should be evaluated" as a high priority conservation action. The Agreement requires Green Diamond to assist this evaluation by "provid[ing] financial and technical support for a marten assisted dispersal feasibility analysis conducted by [the Department.]" Depending on the recommendations of the analysis, Green Diamond shall then "provide financial and technical support for capture and assisted dispersal" of martens in collaboration with the Department. This includes the capture, collar, and release of martens into recommended release areas, including portions of the Enrolled Lands. Lastly, "Green Diamond shall provide financial and in-kind technical support to monitor collared martens" in order "to determine date, movements, territory establishment, reproductive activity, use of resting and denning structures, and habitat use." In total, Green Diamond has agreed to provide $245,000 in funding and $245,000 worth of in-kind support in the form of staff and equipment for the assisted dispersal project.

---

trees for habitat. These scientists contended that aerial images demonstrated the existence of potential suitable habitat on parts of Green Diamond's land, and recommended that the Department rely for its baseline determination not on average age but on "quadratic mean diameter," which they contended would capture important characteristics about the age of forest stands. Notwithstanding the extensive debate over baseline in the record, the Centers do not contest the Department's determination of the baseline.

11

## B. Habitat Management

### 1. *Marten Reserve Area, Management Area, and the Moore Tract*

The Agreement establishes the 127,217-acre Management Area on about a third of the Enrolled Lands.  Located between known occupied marten sites to the east and state and national parks to the north, west, and south, the Management Area is a "high priority connectivity area" that has the potential to serve as a "land bridge" for the dispersal of martens from their presently occupied sites to more suitable habitat within the parks.

The Agreement also establishes a 2,098-acre "Marten Reserve Area" (Reserve Area).  The Reserve Area is located within the Management Area in Del Norte County and is comprised of mostly serpentine habitat.[6]  It is one of the two discrete areas where martens have been detected on the Enrolled Lands.  The Agreement provides that no timber harvesting shall occur within the Reserve Area during the 40-year term of the Agreement.

The Moore Tract, a small area of the Enrolled Lands near the California-Oregon border, is the second discrete area of Green Diamond lands where martens have been detected.  The Agreement limits Green Diamond to one harvest entry within the Riparian Management Zones of the Moore Tract during the term of the Agreement.

Within both the Management Area and the Moore Tract, Green Diamond agreed to retain an unspecified number of "downed large woody debris to enhance structural complexity, foraging, denning, resting, and

---

[6] "In contrast to the dense old growth stand structure used by martens on productive soils, stands used in serpentine soils can include any seral stage and more variable tree over-story canopy closure ranging from sparse (20%) to dense . . . Serpentine habitats used by martens also contain abundant rocky outcrops, providing chambers that martens have used as resting structures when large woody structures are rare."

escape cover benefiting" martens.  Green Diamond also agreed to create slash piles "at a rate averaging one structure for every 5 – 10 acres of clear-cut" to provide further "structural complexity, cover, resting and denning habitat" for martens.

## 2. *TREE Scorecards*

The Agreement requires Green Diamond's timber-harvesting operations to incorporate what the Agreement dubs "Terrestrial Retention of Ecosystems Elements" or TREE Guidelines, intended to preserve trees with elements that are attractive to martens.  The TREE Guidelines are a scorecard that assigns points to various tree features that benefit martens, such as large or small cavities, broken tops, and complex crowns.  Green Diamond's foresters are to compare trees in an area planned for harvesting to the scorecard criteria and award points for each beneficial feature listed, preserving trees that reach a designated score threshold.  In the Management Area and the Riparian Management Zones of the Moore Tract, as well as in additional watersheds where martens are detected during the life of the Agreement, Green Diamond is required to apply a modified scorecard that preserves additional trees.

## 3. *Riparian Management Zone (RMZ) Restrictions*

RMZ "refers to forestlands designated in the 2008 Aquatic Habitat Conservation Plan (Aquatic Plan) approved by the National Marine Fisheries Service" and include portions of the Enrolled Land that border a watercourse or surround a lake or spring.  The Aquatic Plan is a voluntary agreement that Green Diamond entered into with the United States Fish and Wildlife Service pursuant to the federal Endangered Species Act.  The Aquatic Plan requires the retention of snags and trees and "specifies several conservation

13

measures that Green Diamond must perform within RMZs, which constitute 90,000 acres, or approximately 25% of the Enrolled Lands."

The Agreement requires that Green Diamond implement the measures currently defined under the Aquatic Plan on all Enrolled Lands covered under the Aquatic Plan. The Agreement further builds on the Aquatic Plan by limiting Green Diamond to one harvest entry within the RMZs on the Moore Tract during the term of the Agreement since martens were detected there. The only exception to this is "light thinning conducted with the specific objective of enhancing wildlife structure."

### 4. *Den Protection*

Finally, the Agreement requires that Green Diamond retain all marten natal and maternal dens it discovers or is made aware of on the Enrolled Lands, and to incorporate tree retention around these den structures, whether occupied or not, during and post timber harvest operations. Green Diamond is further required to establish a "0.5-acre no-harvest habitat retention area" around all natal dens, and any harvest in this retention area may only be done in consultation with the Department with the goal of increasing or accelerating the development of large trees within the area.

### C. Take Avoidance and Minimization

Pursuant to the Safe Harbor Act, the Agreement authorizes Green Diamond "to take the Covered Species incidental to implementing the Management Actions and Management Practices."[7] As required under

---

[7] "Management Actions" are defined in the Agreement as "activities conducted on the Enrolled Lands that are reasonably expected to provide a net conservation benefit for the Covered Species within the Enrolled Lands." "Management Practices" are defined as "Green Diamond's land use and maintenance activities on the Enrolled Lands that affect the Covered Species or their habitat," including timber operations.

section 2089.2, subdivision (d), the Agreement provides that it "shall not reduce the existing populations of species or habitat present at the time the baseline is established by [the Department.] The Agreement reiterates however, that based on the limited number of detections, "a reliable estimate of the number of martens currently existing on Enrolled Lands is unavailable and it is not possible to assess any trend in the marten population at this time."

The Agreement implements three measures to avoid or minimize the incidental taking of martens or returning the Enrolled Lands to baseline conditions.[8] The first is to mark for retention or non-disturbance all known marten-occupied den sites. Further, if the den site is within 0.25 miles of a timber harvesting unit, a 0.25-mile buffer zone will be created and timber operations shall not occur within that zone during the marten denning season, unless Green Diamond and the Department determine that the den site is unoccupied. The second measure is to "ensure all water tanks and pipes used for timberland management . . . are marten-proofed to prevent entrapment and/or drowning." The water tanks and pipes are then to be checked at least once a year to ensure they are still secured against marten entry.

The third measure is to "prevent unauthorized marijuana cultivation and associated abuse of pesticides on the Enrolled Lands." To accomplish this, Green Diamond is to "maintain a system of controlled access . . . using locked gates on roads, security patrols, and written permits for authorized

---

[8] This is pursuant to a separate provision under the Safe Harbor Act which requires that the Department "finds that the landowner has agreed, to the maximum extent practicable, to avoid or minimize any incidental take authorized in the agreement, including returning to baseline." (§ 2089.6, subd. (a)(5).)

use of the Enrolled Property." Green Diamond must also "conduct at least one annual aerial surveillance for marijuana cultivation hot spots where martens are likely to be exposed to pesticide use on the Enrolled Lands, and provide annual safety training for field employees on detection and reporting of suspicious and unauthorized use of the Enrolled Property."

### D. Monitoring and Reporting, Modification, and Termination

Pursuant to section 2089.6, subdivision (a)(6), the Agreement requires that Green Diamond implement a monitoring program and submit annual monitoring reports "to provide information for [the Department] to evaluate the effectiveness and efficiency of this Agreement, including whether the Net Conservation Benefits set forth in this Agreement are being achieved and whether the provisions of this Agreement are being implemented." Ten specific monitoring and reporting requirements are listed. These include monitoring radio-collared martens that are captured and released pursuant to the assisted dispersal plan and conducting non-invasive surveys to estimate marten occupancy in the Management Area and the Enrolled Lands over time.[9] Green Diamond is also required to establish an internal compliance team that will include an experienced wildlife biologist as the Agreement Coordinator who will review "each proposed THP during its development and inform[] the registered professional forester[] preparing the THP when any special Agreement-related restrictions and/or mitigations occur in the area."

---

[9] We do not further discuss these monitoring and reporting requirements since the Centers do not challenge the sufficiency of the monitoring program under section 2089.6, subdivision (a)(6). We note however, that this is a separate and distinct requirement from the finding of net conservation benefit under section 2089.6, subdivision (a)(3).

The Agreement further provides for "Adaptive Management" which "allows for mutually agreed-upon changes to the Agreement's Management Actions and Management Practices in response to changing conditions or new information" that will better serve to avoid or minimize incidental take or provide a net conservation benefit. For example, the parties could agree to increase the number of slash piles Green Diamond creates if monitoring shows that martens benefit from them.

Lastly, the Department has the discretion to terminate the Agreement prior to its expiration date under certain enumerated conditions, including if it determines that "the Agreement is not providing the Net Conservation Benefit anticipated or otherwise is not satisfying the requirements of the Program."

## V.

### *Procedural History*

The Centers filed a petition for writ of mandate that challenged the Department's approval of the Agreement under the Safe Harbor Act. Specifically, the Centers argued the Department erred in finding that the Agreement provided a net conservation benefit and that it would not jeopardize the continued existence of Humboldt martens based on "the best scientific and other information that is reasonably available." (§ 2081, subd. (c).) A certified administrative record containing 542 documents (or approximately 9,000 pages) was lodged with the trial court. The record included various scientific literature on Humboldt martens, the Assessment, and hundreds of e-mails among Department staff members and between the Department and Green Diamond regarding the Agreement's development and terms.

Following briefing by the parties, the trial court held a one-day bench trial and thereafter issued a statement of decision.[10]  At the onset, the court determined that the proper standard of review was whether the Department's decision was arbitrary or capricious pursuant to a traditional mandamus and not whether the decision was supported by substantial evidence pursuant to an administrative mandamus as the Centers argued.  The court however, noted that its decision would be the same even under a substantial evidence standard of review.

The trial court held that the Centers failed to show that the administrative record did not support the Department's conclusion that the Agreement was reasonably expected to provide a net conservation benefit to Humboldt martens.  The court further held that the Centers failed to show how the Agreement's habitat preservation measures could jeopardize the martens and that the Department "made a reasonable finding of no jeopardy . . . based on the cumulative benefits of Green Diamond's conservation commitments relative to any impacts on the Martens."  The trial court denied the Centers' petition and entered judgment in favor of the Department and Green Diamond.

The Centers now appeal.

## DISCUSSION

### I.

### *Standard of Review*

In a mandamus action, our review of the administrative record "is the same as the trial court's:  The appellate court reviews the agency's action, not the trial court's decision; in that sense appellate judicial review . . . is de

---

[10] The trial court requested and received proposed statements of decision from the parties following the bench trial.

novo." (*Vineyard Area Citizens for Responsible Growth, Inc. v. City of Rancho Cordova* (2007) 40 Cal.4th 412, 427 (*Vineyard Area Citizens*).)

The Centers argued below that the trial court should review the Agreement using an administrative mandamus standard.  Under this standard of review, "abuse of discretion is established if the court determines that the findings are not supported by substantial evidence in the light of the whole record." (Code Civ. Proc., § 1094.5, subd. (c).)  The Department argued that review was proper under traditional mandamus standards (Code Civ. Proc., § 1085), which looks at "whether the [agency's] decision was arbitrary, capricious, or entirely lacking in evidentiary support." (*Bunnett v. Regents of University of California* (1995) 35 Cal.App.4th 843, 849.)

The trial court held that traditional mandamus was the proper standard of review since the Department's decision approving the Agreement was more akin to a quasi-legislative action than to an adjudicative or quasi-adjudicative action which would be subject to administrative mandamus review.  The court also noted that its decision "would be the same even if it applied the substantial evidence test to the circumstances here presented."

We need not resolve the merits of this issue because, like the trial court, we find that even under the less deferential administrative mandamus standard, there is substantial evidence to support the Department's approval of the Agreement under the Safe Harbor Act.

## II.

### *The Centers Have Standing*

Green Diamond first contends that the Centers do not have standing to challenge the Department's approval of the Agreement because they have not shown "how they are injured by the Agreement or how this action promotes the public interest" since the Agreement "is working."  In general, a party

19

must be "beneficially interested" to seek a writ of mandate.  (Code Civ. Proc., § 1086.)  This requirement "has been generally interpreted to mean that one may obtain the writ only if the person has some special interest to be served or some particular right to be preserved or protected over and above the interest held in common with the public at large."  (*Carsten v. Psychology Examining Com.* (1980) 27 Cal.3d 793, 796.)

"Nevertheless, ' "where the question is one of public right and the object of the mandamus is to procure the enforcement of a public duty, the [petitioner] need not show that he has any legal or special interest in the result, since it is sufficient that he is interested as a citizen in having the laws executed and the duty in question enforced." ' [Citation.]  This ' "public right/public duty" exception to the requirement of beneficial interest for a writ of mandate' 'promotes the policy of guaranteeing citizens the opportunity to ensure that no governmental body impairs or defeats the purpose of legislation establishing a public right.' [Citations.]  We refer to this variety of standing as 'public interest standing.' " (*Save the Plastic Bag Coalition v. City of Manhattan Beach* (2011) 52 Cal.4th 155, 166.)

Here, we find the Centers have "public interest standing" to bring the subject action and therefore need not decide whether the Centers are also beneficially interested under Code of Civil Procedure, section 1086.  The Centers are non-profit environmental organizations that brought the subject writ for violation of the Safe Harbor Act under CESA.  "Laws providing for the conservation of natural resources are of great remedial and public importance . . . ."  (*San Bernardino Valley Audubon Society v. City of Moreno Valley* (1996) 44 Cal.App.4th 593, 601.)  Moreover, the object of the Centers' writ is to enforce the Department's public duties under the Safe Harbor Act

in ensuring that certain conditions are met before it authorizes the incidental take of an endangered species like Humboldt martens by a landowner.

Green Diamond argues the Centers lack standing because they failed to present evidence that the subject action promotes a public interest because the Agreement "was reasonably expected to work—and is working." However, whether there is substantial evidence to support that the Agreement is reasonably expected to provide a net conservation benefit and will not jeopardize the continued existence of the martens are the very issues we are deciding in this subject appeal. Green Diamond cannot unilaterally conclude that the Agreement is in fact "working" in order to attack the Centers' standing under the public interest exception. Although we have taken judicial notice of Green Diamond's annual reports which include the detection of martens on the Enrolled Lands, those by themselves do not establish that the Agreement has met the conditions set forth under the Safe Harbor Act.

## III.

### *The Net Conservation Benefit Finding is Supported by Substantial Evidence*

The Centers contend that no substantial evidence supports the Department's finding that the Agreement is reasonably expected to provide a net conservation benefit under section 2089.6, subdivision (a)(3). "Net conservation benefit" is defined as "the cumulative benefits of the management activities identified in the agreement that provide for an increase in a species' population or the enhancement, restoration, or maintenance of covered species' suitable habitats within the enrolled property." (§ 2089.4, subd. (h).) In making this finding, "the length of the agreement, any offsetting adverse effects attributable to the incidental taking allowed by the agreement, and other mutually agreed upon factors" must be

21

considered.  (*Ibid.*)  "Net conservation benefits shall be sufficient to contribute either directly or indirectly to the recovery of the covered species. These benefits include, but are not limited to, reducing fragmentation and increasing the connectivity of habitats, maintaining or increasing populations, enhancing and restoring habitats, and buffering protected areas."  (*Ibid.*)

As discussed above, we review the Department's findings for substantial evidence in the light of the entire administrative record.  (Code Civ. Proc., § 1094.5, subd. (c).)  Under this standard, great deference is afforded to the Department's substantive factual findings and "the reviewing court 'may not set aside an agency's approval . . . on the ground that the opposite conclusion would have been equally or more reasonable,' for, on factual questions, our task 'is not to weigh conflicting evidence and determine who has the better argument.' "  (*Vineyard Area Citizens*, *supra*, 40 Cal.4th at p. 435.)

In reviewing the Department's determination, we are also cognizant that "[w]e are neither scientists nor policy makers.  The agencies entrusted with the statutory obligation of balancing the needs of human populations with those of endangered plants and animals are guided by the expertise of their scientific staffs and independent consultants.  We cannot supplant their decisions because we find the views of other experts and other policy options more appealing."  (*Environmental Council of Sacramento v. City of Sacramento* (2006) 142 Cal.App.4th 1018, 1042 (*Environmental Council of Sacramento*).)

Based on the record before us and the deferential standard of review, we find no abuse of discretion in the Department's determination that the

22

Agreement is reasonably expected to provide a net conservation benefit to the martens.[11]

## A. Failure to Analyze Adverse Effects

### 1. *The Centers Did Not Forfeit this Argument*

The Centers first argue that in determining net conservation benefit, the Department failed to analyze the offsetting adverse effects attributable to the incidental take of martens allowed by the Agreement. (§ 2089.4, subd. (h).) The Department contends that the Centers forfeited this argument because they failed to raise it before the trial court. In general, appealing parties must adhere to the theory they presented before the trial court and may not assert a new theory for the first time on appeal. (*Hewlett-Packard Co. v. Oracle Corp.* (2021) 65 Cal.App.5th 506, 548.) This rule is grounded on principles of fairness to both the trial court and the opposing parties. (*Ibid.*) An exception to this rule exists however, when a new theory raised on appeal pertains only to questions of law on undisputed facts in the record. (*Ward v. Taggart* (1959) 51 Cal.2d 736, 742.)

Although the Centers did not raise the exact argument below that they now raise on appeal, their arguments below are sufficiently related such that the principles of fairness are not violated in our consideration of the Centers' argument regarding adverse effects. For example, the Centers argued in their brief below that there was no substantial evidence to support that the Agreement would provide a net conservation benefit. The Centers also argued there was no substantial evidence to support the Department's "no

---

[11] The Department and Green Diamond argue that the Centers failed to discuss *all* material evidence in the record and ignored substantial evidence that was unfavorable to their position. While we agree that the Centers' summary of the evidence was lacking in some respects, we do not find it so incomplete or one-sided as to warrant a finding of waiver by the Centers.

jeopardy" determination based in part on the Department's failure to analyze "any adverse impacts of the taking" as required under section 2081, subdivision (c). The Centers further argued that the Department failed to analyze "the practicability of more stringent measures to minimize incidental take."

Moreover, the issue presented before us is a question of law—whether the Department violated the provisions of the Safe Harbor Act in approving the Agreement—based on the undisputed facts that appear in the administrative record. Thus, even if the Centers' argument is considered a new one, we exercise our discretion and consider it here.

### 2. *The Department Considered the Adverse Effects Attributable to Incidental Taking*

The record reflects that the Department considered and weighed the adverse effects attributable to the incidental take of martens that is allowed by the Agreement. The Agreement itself recognizes that Green Diamond's timber operations "may result in habitat modification and the incidental take of martens. Road construction, harvest operations, and forest management practices may take denning females and kits through removal of the denning structure, or disturbance causing abandonment of the occupied den resulting in death of dependent kits and possible, but unlikely, direct harm or death to the female." The Agreement further notes that "[v]ehicular strikes resulting from use of forest roads and accidental entrapment in water facilities resulting in death or drowning of martens may also take martens."[12]

The Department and Green Diamond discussed the importance of the retention of habitat around known marten den sites during the negotiation of

_____

[12] This refutes the Centers' argument that the Department only weighed the adverse effects from Green Diamond's conservation measures, and not from its management practices such as timber harvesting.

the Agreement. The final Agreement implements several avoidance and minimization measures, including the retention of known den sites and a 0.25-mile radius zone around these sites in which no timber operations are allowed to take place during the martens' denning season, with a few exceptions. In recognizing that any martens on the Enrolled Lands may also be at risk of getting trapped and drowning in water facilities, Green Diamond agreed to "marten-proof" all water tanks and pipes and to check them annually for potential marten entry. This shows that the Department not only considered the adverse effects attributable to the incidental take of martens, but considered the ways in which these effects could be minimized or avoided under the Agreement.

The record therefore supports that the Department weighed the adverse effects against Green Diamond's various habitat management and assisted dispersal commitments and found that the Agreement provided a net conservation benefit to the martens. This finding was bolstered by the fact that certain measures would be taken to avoid or minimize any incidental take of martens that enter onto the Enrolled Lands. Again, we afford the Department's factual findings great deference since we do not have the scientific background or expertise that the Department does in this subject area. (*Environmental Council of Sacramento, supra,* 142 Cal.App.4th at p. 1042.) Moreover, that there is also evidence that supported the Centers' position does not entitle us to weigh conflicting evidence in their favor where the Department's decision is supported by substantial evidence. (*Vineyard Area Citizens, supra,* 40 Cal.4th at p. 435.)

## B. Assisted Dispersal

There is substantial evidence to support the Department's determination that the Agreement's assisted dispersal commitments are

reasonably expected to provide a net conservation benefit to the martens. As already discussed, one of the main conservation strategy goals highlighted in the Assessment was to "[p]romote expansion and re-establishment of populations into currently suitable but unoccupied habitat." Because a portion of the Enrolled Lands is situated between an extant marten population to the east and suitable marten habitat to the west in the old-growth forests, the Enrolled Lands were identified as a connectivity improvement area with currently unsuitable marten habitat. However, since it could take decades of habitat restoration efforts for this area to acquire suitable habitat conditions to support functional connectivity for the martens, the Assessment encouraged the evaluation of "translocation of individuals to unoccupied suitable areas" or assisted dispersal. To that end, the Assessment identified "the efficacy of assisted dispersal" as a "high priority information need."

In responding to this informational need, the Agreement commits Green Diamond to contributing $245,000 in funding and an additional $245,000 worth of staff and equipment towards the Department's assisted dispersal project. This project includes first conducting a feasibility analysis and then, depending on the outcome of the analysis, potentially capturing, collaring, and releasing martens into "recommended release areas" that include portions of the Enrolled Lands. The collared martens would then be monitored "to determine fate, movements, territory establishment, reproductive activity, use of resting and denning structures, and habitat use." During the negotiation of the Agreement, the Department recognized assisted dispersal to be a main benefit of the Agreement.

The Centers contend the Department erred in finding that the assisted dispersal commitments provided a net conservation benefit given that (1) a

26

feasibility study had not yet been conducted; and (2) relocation of martens may be infeasible or risky since martens would be relocated onto the Enrolled Lands and not within the state and national parks. First, we disagree with the argument that a feasibility study should have first been conducted before the Agreement was finalized. As further discussed below, the Agreement also includes a number of habitat management commitments that are reasonably expected to provide a net conservation benefit to the martens.[13] Accordingly, the Department's net conservation benefit finding did not hinge on the feasibility of assisted dispersal.

Second, even if the study ultimately concludes that assisted dispersal is not feasible, the study itself would still provide a benefit since information would be obtained from it as to the efficacy and challenges of assisted dispersal that could be used in future marten studies or projects. In *Friends of Animals v. United States Fish & Wildlife Service* (9th Cir. 2022) 28 F.4th 19, the Ninth Circuit considered whether information obtained from a barred owl removal experiment constituted a net conservation benefit under the federal Endangered Species Act. (*Friends of Animals*, at p. 29.) The court held that it did because "conservation" was broadly defined under the Endangered Species Act "as 'all methods and procedures' necessary for the recovery of the species, which 'include, but are not limited to, all activities associated with scientific resources management such as *research.*'" (*Ibid.*) CESA's definition of "conservation" is substantively identical to its federal counterpart and also includes reference to "research" as part of the "methods

_____

[13] Internal e-mails show that the Department's staff contemplated waiting to complete the feasibility study first before including assisted dispersal in the Agreement but found this to be unnecessary given the other commitments in the Agreement and the length of time it would take to complete the study.

and procedures" necessary for the recovery of an endangered species. (§ 2061.) We therefore similarly find that an informational benefit constitutes a net conservation benefit under CESA.

The Centers argue that although an informational benefit may constitute a net conservation benefit in some cases, any informational benefit from the feasibility study here does not offset the adverse effects of allowing incidental take, unlike the barred owl study conducted in *Friends of Animals*. This might be the case if we considered the informational benefit of the feasibility study in isolation, but the Safe Harbor Act makes clear that it is the *cumulative* benefits of the management actions that must be considered in determining whether the Agreement provides a net conservation benefit. (§ 2089.4, subd. (h).) Here, substantial evidence supports the Department's conclusion that the informational benefits obtained from the feasibility study, combined with the other habitat management commitments, provide a net conservation benefit to the martens.

## C. Habitat Management Commitments

There is substantial evidence to support the Department's finding that the Agreement's habitat management commitments, when considered cumulatively, are "reasonably expected to provide a net conservation benefit." (§ 2089.6, subd. (a)(3).) One of the Assessment's stated conservation strategy goals was to "[i]mprove habitat conditions in order to facilitate functional connectivity, successful dispersal between areas of suitable but unoccupied habitat and between extant populations. There is evidence to support that the commitments will be beneficial in "the enhancement, restoration, or maintenance of [the martens'] suitable habitat" within the Enrolled Lands which will in turn, increase the connectivity of the martens' habitats in

bringing them closer to their suitable and ideal habitat in the state and national parklands to the west. (§ 2089.4, subd. (h).)

We are not persuaded by the Centers' initial argument that during the negotiation process, Green Diamond "refused to agree to measures that would make its business more difficult or costly" and that the management actions it did put forth were already standard practice or "would not appreciably impact its actual operations." While we recognize the incremental nature of Green Diamond's conservation commitments, the relevant standard is whether the commitments that were ultimately agreed to were "reasonably expected to provide a net conservation benefit to" Humboldt martens. (§ 2089.6, subd. (a)(3).) Even if certain management actions already constituted standard practices for Green Diamond, there is still a benefit in Green Diamond committing to continue these practices for the 40-year duration of the Agreement as it would not otherwise be required to do so. This includes the measures defined under the Aquatic Plan since Green Diamond or the United States Fish and Wildlife Service could otherwise revoke or suspend the Aquatic Plan in the interim.

The Centers' primary concern is that the Enrolled Lands are "managed lands" logged by Green Diamond and therefore are not compatible with the habitat needs of Humboldt martens. It is certainly the case that martens prefer old-growth forests with dense shrub layers to lands where timber harvesting has occurred. But, as the Centers conceded at oral argument, CESA's no-take mandate prohibits only the harming of members of an endangered species and not harms to their preferred habitats. Moreover, although the Assessment noted martens' sensitivity to fragmentation of high-quality habitat, it also highlighted that "with careful management to maintain and regenerate critical structures and if certain thresholds are not

29

surpassed, martens *can be maintained along with timber production.*"
(Italics added.)

The record provides substantial evidence from which the Department concluded that Green Diamond's habitat-management commitments will improve habitat on the Enrolled Lands, and that these improvements are reasonably expected to provide a net conservation benefit to martens. (§ 2089.4, subd. (h).)  Based on its location, a portion of the Enrolled Lands is a connectivity area that could serve as a "land bridge" between Yurok tribal lands to the east where a core marten population resides and old-growth forests in state and national parks to the west that are ideal habitat for the martens.

At the time of the Agreement, martens were rare or absent from the Enrolled Lands except for on the Moore Tract and the Reserve Area. Accordingly, the Agreement limits Green Diamond to one harvest entry within the RMZs in the Moore Tract and no timber harvesting within the Reserve Area during the term of the Agreement.  The Centers contend that the Reserve Area does not produce trees suitable for commercial logging due to its serpentine soil, so Green Diamond would likely not have logged this area even in the absence of the Agreement.  However, this does not negate the conservation benefit created by Green Diamond's commitment not to conduct *any* logging for 40 years in an area where martens have been detected.  A management activity that provides for the maintenance of a covered species' suitable habitat is by definition a "net conservation benefit." (§ 2089.4, subd. (h).)

The Agreement further provides for the retention and creation of various habitat features that are reasonably expected to benefit the martens. Marten-specific TREE measures are required to be implemented in both the

Management Area (a "high priority connectivity area" that would serve as the location for assisted dispersal) and the Moore Tract. The TREE scorecard system will lead to the retention of more trees with features beneficial to the martens and in turn, will also contribute to an increased average forest age.

We acknowledge that the Agreement's commitments will not create ideal habitats for martens. But we also recognize that the Enrolled Lands are private lands used for timber harvesting, and the Agreement was voluntarily undertaken by Green Diamond. Without the Agreement, incidental take would be prohibited, but it is very likely that Green Diamond would have continued its logging operations, since martens are currently rare or absent from most of the Enrolled Lands. The Department appropriately measured the net benefit to martens from the Agreement not against a better hypothetical agreement but against the status quo. Its determination that the conservation measures set out in the Agreement—limitations on harvesting in specified areas where martens are present, the retention of a larger number of mature trees with features that draw martens, the retention of woody debris and slash piles for resting and denning, buffer areas around natal dens, and other measures—are reasonably expected on balance to benefit martens is supported by substantial evidence in the record.

**IV.**

### *The No Jeopardy Finding is Supported by Substantial Evidence*

In their supplemental brief, the Centers argue there is no evidence to support the Agreement's finding that "[t]he take authorized by this Agreement will not jeopardize the continued existence of the Covered Species based upon the provisions of subdivision (c) of section 2081 of the Fish and

31

Game Code." [14]  Section 2081, subdivision (c) in turn provides that a no jeopardy finding must be "based on the best scientific and other information that is reasonably available, and shall include consideration of the species' capability to survive and reproduce, and any adverse impacts of the taking on those abilities in light of (1) known population trends; (2) known threats to the species; and (3) reasonably foreseeable impacts on the species from other related projects and activities."

Again, we exercise the required deferential standard in reviewing the Department's finding of no jeopardy.  "We will not arbitrate between scientists and we will not intrude on the public agencies' duties to make policy and protect the species." (*Environmental Council of Sacramento*, *supra*, 142 Cal.App.4th at p. 1042.)  Further, the Department's finding does "not need to be extensive or detailed" so long as " ' "reference to the administrative record informs the parties and reviewing courts of the theory upon which an agency has arrived at its ultimate finding and decision . . . ." ' " (*Environmental Protection Information Center v. California Dept. of Forestry & Fire Protection* (2008) 44 Cal.4th 459, 516.)

The administrative record contains over a hundred scientific articles and studies regarding martens and their habitat needs.  The 126-page Assessment is perhaps the most comprehensive source of information on Humboldt martens to date and is cited extensively in the parties' briefs.  The Assessment discusses the Humboldt martens' distribution and population trends, their ability to survive and reproduce, the current and potential threats affecting their populations, and high priority conservation actions "to

[14] This court requested the parties submit supplemental briefing as to what evidence supports or fails to support the Agreement's finding of "no jeopardy."  Each party thereafter submitted a letter brief, as well as a response letter brief.

ameliorate impacts of each specific threat with moderate to high impact levels."

As mentioned above, although the Assessment provides that martens are sensitive to habitat fragmentation, it also states that "martens can be maintained along with timber production" with "careful management to maintain and regenerate critical structures." A prior article by the Assessment's authors noted there was a surprising and significant number of marten detections in open pine forests with serpentine soils. This suggested to the authors that in addition to large standing trees and down logs found in old-growth forests, structures like rock piles and boulders found in these open sites also provided suitable resting and denning sites for the martens.

Substantial evidence then, supports that the Department considered the best scientific information reasonably available, including the adverse impacts of taking given known population trends and known threats to Humboldt martens, in concluding that the Agreement would not jeopardize the continued existence of this species. (§ 2081, subd. (c).) The Centers disagree and argue that the Agreement "allows Green Diamond to kill an unlimited number of martens as it destroys large swaths of marten habitat and maintains unsuitable conditions on its lands." This is not a reasonable or realistic representation given what the underlying circumstances and facts are here.

It is undisputed that historical logging practices have been identified as a known threat to Humboldt martens. It is also undisputed that the Enrolled Lands are commercially logged lands. However, it is also important to remember that these martens have been largely absent or rare from the Enrolled Lands, so there is not an immediate concern that an "unlimited number of martens" will be taken as a result of Green Diamond's logging

33

operations. The analysis would be different if, for example, Green Diamond sought to log lands which already contained established marten populations without any avoidance measures in place to guard against incidental take.

In addition to assisted dispersal, the Assessment recommended that "conservation actions to improve conditions in key areas [were] needed immediately." These key areas are the connectivity improvement areas, including the Enrolled Lands, located "between extant populations and areas that are currently suitable but unoccupied." The overarching goal of these recommended conservation actions is to promote the expansion and re-establishment of marten populations within their suitable habitats. In response to these recommendations, the Agreement sought to create or improve important marten habitat features on the Enrolled Lands, including those that would minimize known threats to the martens.

The retention of slash piles, woody debris, and trees through the TREE scorecard system for example, provides martens with more structures to rest within and hide from predators. This recognizes that "predator avoidance has likely been an important factor shaping their evolution" and ability to survive. Moreover, in the two areas martens have been detected on the Enrolled Lands, the Agreement minimizes the threat of logging by either prohibiting or severely limiting timber harvesting in these areas.

As the trial court noted, if no martens make their way onto the Enrolled Lands, then no take will occur on the Enrolled Lands. If some martens do make their way onto the Enrolled Lands due to the improved habitat features, the Agreement implements certain minimization measures to avoid any incidental take. The den retention and related no-harvest zone measures for example, guard against the recognized threat that timber harvest operations "may take denning females and kits through removal of

34

the denning structure, or disturbance causing abandonment of the occupied den resulting in death of dependent kits."

Measures against unauthorized marijuana cultivation on the Enrolled Lands directly minimizes the threat to martens from the "uncontrolled use of rodenticides and other toxic chemicals in the illegal production of marijuana" as highlighted in the Assessment. The Agreement incorporates the Assessment's direct recommendations and requires that Green Diamond maintain locked gates on roads and conduct aerial surveys "for marijuana cultivation hot spots where martens are likely to be exposed to pesticide use on the Enrolled Lands." These commitments show that the Department not only considered known threats to martens and reasonably foreseeable impacts on martens from activities like timber harvesting and marijuana cultivation (§ 2081, subd. (c)), but also put in place measures to actively minimize these threats and impacts to avoid incidental take.

In *Environmental Council of Sacramento, supra*, 142 Cal.App.4th at pages 1043–1044, the court found that substantial evidence supported the Department's finding of no jeopardy to support its incidental take authorization of threatened species of hawks and snakes under a conservation plan. The court concluded that "Presumably because the Conservation Plan minimizes and fully mitigates the impacts of the take of the threatened species, the Department also found it would not jeopardize the continued existence of the hawks and snakes." (*Id*. at p. 1043.) These minimization and mitigation features "including the purchase of reserve lands to be developed and maintained as a high quality habitat, adaptive management . . . and extensive compliance and biological effectiveness monitoring." (*Ibid*.) Likewise here, the avoidance and minimization measures discussed above, combined with the Agreement's adaptive

35

management provisions and monitoring program, support the Department's finding of no jeopardy.

The Centers point out that although the Agreement has a provision that prohibits Green Diamond from causing the marten population on the Enrolled Lands to drop below the "baseline," this provides no backstop against how many martens Green Diamond may take since the Agreement set the baseline to zero martens. We do not find this line of argument persuasive because it assumes both that a large number of martens will come onto the Enrolled Lands and that Green Diamond will take most or all of them. This assumption is contrary to evidence in the administrative record that martens can persist on managed lands, and disregards the measures set out in the Agreement to avoid or minimize incidental take of martens that find their way onto the Enrolled Lands.

Finally, the Agreement "allows for mutually agreed-upon changes" to be made to these measures "in response to changing conditions or new information" to better avoid any incidental take or to provide a net conservation benefit. The Department also has the ability to terminate the Agreement in its discretion if it finds that "the Agreement is not providing a Net Conservation Benefit or otherwise is not satisfying the requirements of the Program." These adaptive provisions further ensure that the Agreement will not jeopardize the continued existence of Humboldt martens as the Department can take ameliorative action in the event the adverse impacts of any taking become unjustified in light of the benefits.

## DISPOSITION

The judgment denying the Centers' petition for writ of mandate is affirmed. Each party shall bear its own costs.

_____
Van Aken, J.*


We concur:


_____
Stewart, P.J.


_____
Miller, J.


*Environmental Protection Information Center et al. v.  Department of Fish and Wildlife; Green Diamond Resource Company, RPI* (A163051)


        * Judge of the San Francisco Superior Court, assigned by the Chief Justice pursuant to article VI, section 6 of the California Constitution.